## HORST, MAYOR, &c., ET AL. *vs.* MOSES, ET AL.

[BILL IN EQUITY TO ENJOIN INVASION OF FRANCHISE, &c.]

1. *Act to establish Mobile Charitable Association, &c. ; what right did not confer.*—The act of the General Assembly of Alabama, entitled "an act to establish the Mobile Charitable Association, for the benefit of the common school fund of Mobile, without distinction of color," approved December 31st, 1868, does not authorize the "partnership association," therein mentioned, to keep or exhibit a table for gaming. The awards and distributions, authorized by said act, can not be determined by means of the "roulette wheel," or by the use of the "oblong box and balls," used in the manner that "keno" is usually played ; such a method of distributing awards is not authorized by said act. (*By all the Judges.*)

2. *Act to establish Mobile Charitable Association ; unconstitutionality of.*—The act to establish the Mobile Charitable Assoeiotion, &c., approved December 31st, 1868, is repugnant to article IV, section 2, of the State constitution, for variance between the subject of the act and that expressed in its title. It is also violative of article I, section 32, of the State constitution, because it confers an exclusive privilege on the partnership. (PETERS, J., *dissenting.*)

3. *Power of General Assembly to confer exclusive privileges ; test of.*—The test of the power of the legislature to confer franchises on particular individuals is, whether the privilege conduces to the public good, and is such as must be committed to a few in order to be available.

PECK, C. J., held, 1. That the act of the 31st December, 1868, did not create a contract between the State and the parties and their associates named in said act, but was a mere proposal that only became a contract on the payment of the sum named in the second section of said act.

2. That such contract was not a contract for the period of ten years; but for one year only, from the date of said payment.

3. That as it was at the mere option of said parties and their associates, at the end of the year to renew, or not to renew said contract, the State had the same option to withdraw her proposal and to repeal said act.

4. That as the State repealed said act on the 8th of March, 1871, book of acts, p. 217, when no contract, in fact, existed between her and said parties and their associates, the payment made by them to the superintendent of common schools of the county of Mobile, after the repeal of said act, was a payment made without authority of law, and did not authorize them to do business under said act of the 31st of December, 1868.

5. And if, after the repeal of said act, they proceeded to do business under the same, and in doing so violated the laws of said city of Mobile against

Horst, Mayor, &c., et al. v. Moses et al.

gaming, then they were liable to be prosecuted for such violations, in the same manner as other persons for like offenses.

PETERS, J., in an opinion concurring in the judgment rendered, but dissenting from the reasoning employed by the majority, held, 1. That the act of the 31st December, 1868, creating the "Mobile Charitable Association," grants a "franchise" to "I. C. Moses & Co." and their "associates," upon valuable consideration. This is a contract, which the legislature can not impair by a repealing act.

2. That the 32d section of the first article of the State constitution does not affect this act. That section forbids the grant of "hereditary" franchises and privileges only, not merely exclusive privileges for a limited time.

3. That the *thirteenth* article of the constitution on "corporations," is not intended to apply to such a grant as this. It controls a "general law of incorporations," or "special laws passed pursuant" to that article.

4. That the title of the act contains but one subject, which is clearly expressed.

APPEAL from the Chancery Court of Mobile.
Heard before Hon. ADAM C. FELDER.

This was a bill in equity, filed by the appellees, J. Clifton Moses and Eugene Beebe, against the mayor, aldermen and common council of Mobile, Martin Horst, mayor, R. M. Quinn, chief of police, and McPhillips and Kassens, assistant chiefs of police, praying that the defendants be perpetually enjoined and restrained from interfering with or disturbing complainants in the enjoyment of the franchise and privileges which enured to them, or in carrying on the business which complainants alleged they were entitled to prosecute, by virtue of the following act of the general assembly of Alabama:

"An act to establish the Mobile Charitable Association, for the benefit of the common school fund of Mobile county, without distinction of color.

"SECTION 1. *Be it enacted by the General Assembly of Alabama,* That I. Clifton Moses and Fred. H. Fowler of Mobile, Alabama, and Eugene Beebe of Montgomery, Alabama, and their associates as partners, shall have the full right and authority to form themselves into a partnership association to be known under the firm name and style of "I. C. Moses & Co.," or such other name as they may de-

Horst, Mayor, &c., et al. v. Moses et al.

signate, for the purpose of receiving subscriptions and to sell and dispose of certificates of subscription which shall entitle the holder thereof to such prizes as may be awarded to them, which distribution of award shall be fairly made in public, by casting of lots, or by lot, chance, or otherwise, in such manner as to them may seem best to promote the interest of the school fund of Mobile county, which said distribution of award and prizes shall be made at their office in the city of Mobile, or such other place or places in the State as they may direct.

"SEC. 2. *Be it further enacted*, That before commencing business under the provisions of this act, said parties shall pay or cause to be paid to the board of school commissioners of Mobile county, for the use of the public schools of said county, the sum of one thousand dollars, and annually thereafter a like amount, for the term of ten years, or so long as said partnership shall choose to do business under the provisions of this act. It being understood and agreed, that said payment of one thousand dollars per annum by said partnership to said common school fund, is the consideration upon which this privilege is granted; and whenever said company shall fail to pay said sum, according to the provisions of this act, then, and in that case, their right to do business shall cease.

"SEC. 3. *Be it further enacted*, That during the time business shall be done under the provisions of this act, the same shall be exempt from taxation, except for State purposes.

"SEC. 4. *Be it further enacted*, That this act shall remain in full force and effect for ten years, upon the consideration herein contained, during which time said partnership company shall have the right to exercise the privilege and franchise herein given, any law to the contrary notwithstanding.

"Approved December 31, 1868."

The bill then states facts showing a compliance on the 2d of February, 1869, with the requirements of said act, and the facts alleged as an excuse why the last of the an-

nual payments was not made. The statements of the bill as to the non-payment of the last annual payment of $1,000 were denied in the answer, which alleged that the complainants had forfeited their franchises by this failure; but as the case did not turn on this point, it is unnecessary to refer further to the matter of this payment.

It is further alleged in the bill, that complainants had expended large sums of money in carrying on, and in preparing to carry on their business, and to comply with the requirements of said act. The bill then alleges, that in pursuance of their business, "as they were authorized by the said act, and conducting their said business in strict and entire accordance with the terms of and provisions of last said act, that, in pursuance of their said business, they sold and disposed of certificates of subscription, which, by the terms thereof, and in fact, entitled the holders thereof to such prizes as might be awarded to them in the casting of lots as aforesaid, and that the distribution of awards was in each case made fairly in public by the casting of lots. That, for the purposes aforesaid, they adopted the means or contrivance of what is called a roulette wheel and ball as the lot or chance, which to them seemed best to carry out the objects and purposes of last said act. That the roulette wheel is a revolving circle with a number of holes attached thereto, each of which is numbered, and the wheel is revolved in one direction and at the same time a ball is thrown revolving upon, and inside of said wheel in the opposite direction from that in which the wheel is revolved, and when the ball settles down in any one of the holes, the number attached to that hole is entitled to a prize; and that they have in all cases cast lots as aforesaid, and in the manner aforesaid fairly and in public, and made such distribution of awards and prizes fairly, and in public, and that in each case of said casting of lots as aforesaid, there was only one set of said certificates sold or disposed of for each of said castings of lots as above said and described." It is further alleged in the bill "that, in addition to the wheel and ball as above stated, they also

at times, since December, 1870, used and are still using another method of determining by lot or chance the prizes in their said business, of the following character: In an oblong box are deposited ninety balls, each numbered from one to ninety; printed certificates of subscription are issued to purchasers, each certificate containing three rows of numbers, five in each row; the number of certificates are numbered from one to one hundred and ninety-two, inclusive, and the purchaser of the certificate selects any number of the certificate he desires; each certificate has different figures from every other certificate. The oblong box is revolved and a ball is thrown out; the box is again revolved and another ball thrown out, and so on successively until the numbers on the balls so thrown out correspond with all the numbers in one of the rows on some one of the certificates, and when this occurs, the holder of such is entitled to the prize designated, and thus awarded; and that in each and every instance in the casting of said lots, either by said roulette wheel and ball, or by the oblong box and balls as aforesaid, the same has been conducted fairly and in public, and the distribution of the awards so made and ascertained has been fairly made in public; and that the selection of said modes of determining the prizes and the distribution of the same, was made by your orators as the modes of lot or chance to determine the same, because these modes seemed best to your orators to promote the object of the first said act, and that the mode adopted as aforesaid by the use of the oblong box and balls, is upon the same principle as the game called keno is played or carried on."

The bill further states facts showing that on divers days in April and in June, 1870, and also in August, 1871, one of complainants and several of their agents had been arrested by the police officers of the city of Mobile, and, as they alleged, under authority of the laws and ordinances of the city of Mobile, on the ground that complainants and their agents, in carrying on said business, were violating the ordinance of the city of Mobile against exhibiting a

gaming table. The bill further alleges, that said police officers had arrested various persons attending the drawings had by complainants in carrying on their said business, and that the police officers and city authorities had repeatedly avowed their determination to arrest complainants and their agents, and would in the future continue to arrest them, upon the alleged ground that the business carried on by complainants and their agents was not authorized by the charter, and was in violation of the city ordinances against exhibiting gaming tables, &c.

The bill also alleges, that by reason of the arrests, annoyances, and hindrances above referred to, many persons had been prevented and were prevented from purchasing tickets at complainants' drawings; that complainants' business has been greatly injured thereby, they having been at great expense in preparing to carry on the same; that by reason of the arrests, &c., complainants have been damaged in their business, and put to great expense and sustained large losses, and their business nearly broken up; that if the city authorities and police officers continue to disturb and hinder complainants, and arrest them and their agents and persons who attend the drawings, as complainants charge that defendants will, and as they likewise avow, complainants' business will be utterly broken up and destroyed, and their franchise and the privileges conferred by said act rendered utterly valueless.

It is further alleged in the bill, that the police officers who made the arrest referred to, have not more property than is by law exempt from levy and sale on execution. The bill sets out that portion of the charter of the city prescribing by whom and in what manner arrests may be made for the commission of any public offense or violation of any city ordinance within the limits of the city of Mobile, and alleges that the mayor, aldermen and common council, and the police officers making or ordering the arrest of complainants and their agents, or of persons purchasing certificates of subscription in complainants' drawings, as before detailed, would not be liable to complain-

ants for the damage and losses complainants have already sustained, and would sustain, by reason of the ordering and making of such arrests, inasmuch as defendants would be exercising judicial power, or power in its nature judicial, and in making such arrests themselves, if sued therefor for false imprisonment, could and would allege that they had reasonable grounds for such arrests, and would therefore be free from responsibility for such arrests. The bill further alleges " that unless complainants are protected by the court of chancery, they will be damaged to an extent and in a manner that can not be estimated at law ;" " that their business is of that character which depends upon the number of certificates of subscription purchased in their business, and it will be impossible to make any estimate thereof to any certainty by legal evidence, and for that reason no possible remedy at law can compensate them therefor, even if they could sustain action at law and recover damages for such interference and disturbance of their said business."

The mayor, aldermen and common council, Martin Horst, mayor, and the persons holding the offices of chief of police and assistant chiefs of police are made defendants. Complainants also prayed for the issue of a writ of injunction " directed to said Martin Horst, as mayor aforesaid, enjoining and restraining each and every member of the police force of said city, through him, the said mayor, as the head thereof, from interfering with or disturbing your orators, in the carrying on of their said business, either in the use of the scheme of the roulette table and ball, or in the use of the scheme of the revolving oblong box and balls, on the principle of the game called keno ; or in the sale of their said certificates of subscription in either of said schemes, or disturbing any of their agents employed in carrying on their said business on the plans of either of said schemes, either by arresting your orators or any of their said agents, on the charge or pretense of violating thereby, any ordinance of said city against gaming or against exhibiting a gaming table, either for any past or

future acts done by them or their said agents, in carrying on their said business as aforesaid, on the several schemes as aforesaid, or otherwise disturbing them therein."

There was also a prayer for a similar injunction against interference with persons who had become or might become holders of certificates of subscription, &c., and that on the final hearing the injunction prayed be made perpetual.

Sworn answers to the bill were waived.

Application for an order for the issuance of injunction was made to a circuit judge, who granted the order, and upon complainant's complying with the conditions prescribed in the *fiat*, the injunction issued as prayed for.

The defendants all answered. The answers allege that the act under which complainants claim to carry on their said business was unconstitutional and void; that the privileges which said act purports to grant are privileges not enjoyed by, and which it is not lawful for, the citizens of Alabama at large to enjoy; but that, on the contrary, the citizens of Alabama at large are by its penal laws expressly forbidden to enjoy such privileges, and that the exercise of such privileges are forbidden within the limits of the city of Mobile by the ordinances thereof.

It is admitted that complainants, after the passage of the act, begun the business of carrying on a lottery, but the respondents distinctly deny that complainants did this "under the provisions of and strictly in accordance with the terms of said act; and say that, on the contrary, they disregarded and failed to perform at the very outset the conditions imposed on them by said act, as the consideration thereof; and respondents insist that without the performance of said considerations, according to the terms of said act, no rights passed to complainants under said act, even if the said act were constitutional. Respondents say that complainants and their associates have not confined themselves to the business of carrying on a lottery, as contemplated by said act, but have abandoned the business of keeping and carrying on a lottery only, and have persist-

ently and cunningly evaded the spirit, letter, and intent of said act, by various devices, and have set up, established, operated, kept, and carried on, in the city of Mobile, various devices which are not lotteries; and among them the device of roulette wheel and ball, and also the device known as keno, which are common gamblers' devices and gaming tables, and not lotteries, and which are other than and different in substance from the lottery device first established by them as aforesaid; and respondents say that complainants, under pretext of cover by said act, have set up, kept, and maintained several gambling dens in the city of Mobile, at various places, wherein the said gambling table and device are kept, and which the public is allowed and invited to game for money, greatly to the demoralization of the citizens of Alabama."

The answers also set up facts, to show that complainants had forfeited their franchise by non-payment of one of the annual payments, required by the act, and denying validity of excuses for such non-payment as set up in the bill; but as this part of the case had no material bearing upon the decision, it is not necessary to allude further to it.

In the answers, an elaborate and detailed account is given of the mode and manner in which complainants carry on their business. Drawings and exhibits are attached to the answers, to show that the scheme of drawing and mode of carrying on the business was but a "cunning device to carry on gaming, and to promote the avaricious purposes of complainants to their own profit, without any regard to the objects or purposes of said act, or the benefit of the common school fund of Mobile county." It is also alleged that "the device of a roulette wheel and ball, is not, truly speaking, a lot or distribution of awards, but that the same is a common gambler's game, well known by gamblers, and in use by them as a gaming table in almost all the gambling dens in Europe and America."

It is impossible, without greatly and improperly lengthening the report of the case, to give a more extended syn-

opsis than has already been given, of the minute and lengthy description in the answer of the mode and manner in which complainants carried on their business.

The arrests are admitted, and a purpose avowed to continue them in all lawful modes, to break up what respondents state they are advised is but a mere cover or device for carrying on gaming, and a violation of the laws of the State and the ordinances of the city.

On the 8th of March, 1871, the General Assembly of Alabama passed the following act :

"An act to repeal an act entitled ' an act to establish the Mobile Charitable Association for the benefit of the common school fund of Mobile county, without distinction of color.'

" SECTION 1. *Be it enacted by the General Assembly of Alabama,* That an act entitled ' an act to establish the Mobile Charitable Association for the benefit of the common school fund of Mobile county, without distinction of color,' approved December 31, 1868, be, and the same is hereby repealed.

" Approved March 8, 1871."

The respondents (appellants) also demurred to the bill on the following grounds :

"1. That there is no equity in the said bill.

"2. That said bill shows on its face that complainants have not complied with the terms and conditions upon which the privileges, which the said act of 31st December, 1868, purports to give them, were granted.

"3. That said act of December 31st, 1868, is repealed.

"4. That said bill seeks to enjoin Martin Horst, as mayor of Mobile, and through him the police force of Mobile city, from the exercise of powers conferred on them by law.

"5. That said bill, in effect, seeks to enjoin and restrain the mayor of Mobile, sitting in, and holding, and presiding over, the mayor's court of Mobile, from exercising the quasi-criminal jurisdiction conferred on him by law.

" 6. That said bill seeks to enjoin and restrain the Mayor of Mobile from exercising the duties and authority con-

ferred on him by law, as ex-officio justice of the peace and magistrate.

"7. That said bill seeks to enjoin a trespass.

"8. That said bill shows that complainants have an adequate remedy at law.

"9. That the chancery court has no jurisdiction of the case made by said bill."

The bill was filed August 17th, 1871.

The appellants, on October 17th, 1871, made a motion in vacation to dissolve the injunction, " upon the denials in the answer, and the demurrers filed and for want of equity," which motion was overruled by the chancellor.

The appellants appealed from the order refusing to dissolve the injunction, and here assign the same as error.

R. H. & R. J. SMITH, and THOS. H. HERNDON, for appellants.

O. J. SEMMES, JNO. A. ELMORE, and SAM'L F. RICE, contra.

[The Reporter has been unable to obtain any of the briefs in this case.]

The Judges delivered opinions *seriatim.*

PECK, C. J.—The act of the 31st of December, 1868, (book of Acts, &c., p. 511,) entitled "An act to establish the Mobile Charitable Association, for the benefit of the common school fund of Mobile county, without distinction of color," did not create a contract between the State of Alabama and I. Clifton Moses and Fred. H. Fowler of Mobile, Alabama, and Eugene Beebe of Montgomery, Alabama, and their associates. It was a proposal merely, that would become a contract when accepted by them, and paying to the board of school commissioners of Mobile county, for the use of the public schools of said county, the sum of one thousand dollars, as provided in the second section of said act; but it would not be a contract for the period

of ten years, but only for one year from the date of the payment of said sum of one thousand dollars. By said section said associates were not bound to pay said sum of one thousand dollars annually for the term of ten years, but only for so long as they might choose to do business under the provisions of said act.

As the said associates would be bound by such contract only for the period of one year from the date of each successive annual payment of said sum of one thousand dollars, the State could be bound for no longer time. It is of the essence of a contract, that it must be mutual, if both parties are not bound by it, neither is bound.—*Whitworth and Wife v. Hart*, 22 Ala. 343.

At the end of each year, therefore, the contract would end, and the said act would assume again the character of a proposal; and as the said associates had the right to choose whether they would continue or renew the contract, the State necessarily had the right to choose whether she would continue, or withdraw her proposal, and repeal said act. To hold otherwise would be to destroy all mutuality between the parties, and to take away one of the essential elements of a valid contract. The State chose to withdraw her proposal, and at a time when no contract in fact existed, to repeal said act. This she did by the act of the 8th of March, 1871, (book of Acts, p. 217).

The said act of the 31st of December, 1868, being thus repealed, the subsequent payment of one thousand dollars, made by said associates to E. R. Dickson as superintendent of common schools of Mobile county, on the 19th day of April, 1871, was made without any authority of law, and did not authorize them to do business under said act; did not create any contract between them and the State; and, consequently, gave them no authority, no right to exercise the privilege and franchise named in said act; and if, in claiming to do so, they violated the laws of either the State or the city of Mobile against gaming, they were liable to be proceeded against and punished, in the same manner as other persons guilty of the same offense.

If this is a correct construction of said act of the 31st of December, 1868, as I think it is, then their bill, filed to enjoin prosecutions against them for alleged violations of the laws of the city of Mobile against gaming, and to restrain the appellants and others from instituting such prosecutions, is without equity, and the decretal order of the chancellor overruling appellants' motion to dissolve the injunction granted in this case by the circuit court judge, is erroneous, and must be reversed. And this court, proceeding to render such decree as the chancellor should have rendered, it is hereby ordered, adjudged and decreed, that the said decretal order of the chancellor, rendered in vacation, overruling appellants' motion to dissolve the injunction granted in this case, be, and the same is hereby reversed, and the said injunction is dissolved; and it is further ordered, adjudged and decreed, that the appellees pay the costs of this appeal in this court and in said chancery court.

B. F. SAFFOLD, J.—I hold the act to establish the Mobile Charitable Association, &c., if obligatory on the State as a contract at all, to be so for the term of ten years. It requires the association to pay, or cause to be paid, for the use of the public schools of Mobile county, "the sum of one thousand dollars, and annually thereafter a like amount, for the term of ten years, or so long as said partnership shall choose to do business under the provisions of this act." The payment of the one thousand dollars annually is declared to be the consideration upon which the privilege is granted. The fourth section enacts, "that this act shall remain in full force and effect for ten years, upon the consideration herein contained, during which time said partnership company shall have the right to exercise the privilege and franchise herein given, any law to the contrary notwithstanding." My construction of the language quoted is, that the company may terminate the agreement at pleasure, but that the State can not do so before the expiration of the ten years, except in case of forfeiture.

But has the State authority, under the State constitution,

to sell to a collection of persons, whether a partnership or a corporation, an exclusive privilege to carry on a lottery? The people generally are prohibited from doing so without the legislative sanction.—Revised Code, § 3616. No public law gives this sanction.

Article I, section 32, of the State constitution declares that "no title of nobility, or hereditary distinction, privilege, honor, or emolument, shall ever be granted or conferred in this State." To confer a title of nobility, is to nominate to an order of persons to whom privileges are granted at the expense of the rest of the people. It is not necessarily hereditary, and the objection to it arises more from the privileges supposed to be attached, than to the otherwise empty title or order. These components are forbidden separately in the terms "privilege," "honor," and "emolument," as they are collectively in the term "title of nobility." The prohibition is not affected by any consideration paid or rendered for the grant. Its purpose is to preserve the equality of the citizens in respect to their public and private rights.

How shall we distinguish these prohibitions from the undoubted right of the State to grant certain franchises to particular individuals in exclusion of others, as a ferry or a corporation, or to contract with its citizens, as for the construction of public works? The theory of our government is the recognition of the utmost liberty of the citizen consistent with the welfare of the society. No restraint imposed by law can find justification elsewhere than in the consideration of the public good. There are necessities and conveniences that can only be supplied to the public by committing the duty or the privilege of doing so to a few. One ferry or toll-bridge is sometimes secured only by forbidding two.

Extreme cases sometimes illustrate a principle when intermediate ones serve only to confuse. The right of way for the construction of a railroad is conceded to be a fit subject for the exercise of the State's right of eminent domain, though the recipient is a private party. But a prop-

osition to confer upon the same party the exclusive privilege of selling drugs or liquors would be justly regarded as an outrage. The test of the State's authority, therefore, is this: The privilege that can be conferred must conduce to the public good, and be such as is obliged to be committed to a few in order to be available.

In further proof of this test, the power of the legislature to charter corporations, not municipal, heretofore not questioned, has been specially granted by the constitution, and restricted to the passage of general laws from the benefits of which none are excluded who may comply with the conditions prescribed.—Const. art. 13, § 1. This change of the fundamental law was doubtless due to the conviction that the prohibition against exclusive privileges had not been sufficiently observed by the legislature and the courts.

In view of this more stringent guaranty of the equality of the citizens, shall we say that the legislature has power to sell for a term of years to a partnership, the right to set up and carry on a lottery, and to fine and imprison the rest of the people, if they do the same? Suppose I. C. Moses & Co. alone, of all the people, were forbidden to set up a lottery, or to sell dry goods or groceries. The discrimination would not be based on any consideration of the public good, but would tend to the public detriment.

If the test I have proposed be not the correct one, and sufficiently definite, whence come the *mala prohibita*? Blackstone says, "those rights which God and nature have established, and are therefore called natural rights, such as are life and liberty, need not the aid of human laws to be more effectually invested in every man than they are; neither do they receive any additional strength when declared by the municipal laws to be inviolable. On the contrary, no human legislature has the power to abridge or destroy them, unless the owner shall himself commit some act that amounts to a forfeiture. Neither do divine or natural *duties* (such as, for instance, the worship of God, the maintenance of children, and the like,) receive any stronger sanction from being also declared to be duties by

the law of the land. The case is the same as to crimes
and misdemeanors that are forbidden by the superior laws,
and therefore styled *mala in se*, such as murder, theft and
perjury; which contract no additional turpitude from being
declared unlawful by the inferior legislature, for that legis-
lature in all these cases acts only, as was before observed,
in subordination to the great Law-giver, transcribing and
publishing his precepts. So that, upon the whole, the
declaratory part of the municipal law has no force or ope-
ration at all with regard to actions that are naturally and
intrinsically right or wrong.

But, with regard to things in themselves indifferent, the
case is entirely altered. These become either right or
wrong, just or unjust, duties or misdemeanors, "*according as
the municipal legislator sees proper, for promoting the welfare
of the society, and more effectually carrying on the purposes
of civil life.*"—Vol. 1, p. 54. Experience has since shown a
necessity for controlling somewhat the discretion of the
legislature in the interest of freedom of personal action;
and hence come the rights "reserved to the people." To
prohibit the pursuit of necessary business, or to commit it
to a few, to the exclusion of the rest of the people, would
be a flagrant usurpation on the part of the legislature.
Setting up a lottery is conceded to be the subject of the
*mala prohibita*. Therefore, either the act in question con-
fers an unconstitutional privilege, or the law prohibiting
the people generally from setting up lotteries withholds a
constitutional or reserved right. There is no doubt about
which must fall.

This act is unique in its structure, if not commendable.
It purports "to establish the Mobile Charitable Associa-
tion for the benefit of the common school fund of Mobile
county, without distinction of color." The only benefit
derived by the schools is the money paid as the *considera-
tion of the franchise*. A charitable association is supposed
to have for its object the relief of suffering humanity. The
purpose of I. C. Moses & Co.'s franchise is to put money
in their purses, without rendering an equivalent for it, and

without regard to the reckless gambling propensity it may excite in the community. The application of the words, "without distinction of color," is left to conjecture. Article IV, section 2, of the State constitution says, "Each law shall contain but one subject, which shall be clearly expressed in its title." There is nothing in this act correspondent with the laudable subject so clearly expressed in its title.

I think the injunction ought to be dissolved, on account of the invalidity of the act in question, and because, if valid, it requires the distribution of the prizes to be *fairly made*, which is not the case in the games called keno and roulette.

PECK, C. J., concurs in this opinion as to the unconstitutionality of the act.

PETERS, J.—I can not concur in the reasons assigned by the majority of the court for the judgment pronounced in this cause. A brief statement of the facts and the law, as they impress my mind, will show the grounds of my dissent.

On the 31st day of December, 1868, there was approved by the governor of this State, an act of the general assembly, entitled "An act to establish the Mobile Charitable Association, for the benefit of the common school fund of Mobile county, without distinction of color." The first section of this law, omitting the enacting clause, is in the following words : "That I. Clifton Moses and Fred. H. Fowler, of Mobile, Alabama, and Eugene Beebe, of Montgomery, Alabama, and their associates, as partners, shall have the full right and authority to form themselves into a partnership association, to be known under the firm name and style of "I. C. Moses & Co.," or such other name as they may designate, for the *purpose* of receiving subscriptions, and to sell and dispose of certificates of subscription, which shall entitle the holder thereof to such prizes as may be awarded to them, which distribution of award

shall be fairly made in public, by casting of lots, or by lot, chance or otherwise, in such manner as to them may seem best, to promote the interest of the school fund of Mobile county, which said distribution of award and prizes shall be made at their office, in the city of Mobile, or such other place or places in the State as they may direct."—Pamph. Acts 1868, p. 511, sec. 1. For the "full right and author-ity" thus given, the company above-said agreed to pay to the Board of School Commissioners of Mobile county, for the use of the public schools of said county, the sum of one thousand dollars, and annually thereafter a like sum, for the term of ten years, or so long as said partnership shall choose to do business under the provisions of said act. This statute confers the "privilege and franchise" upon the "partnership company," thereby created for ten years, "upon the consideration therein contained," any law to the contrary notwithstanding.—Acts 1868, pp. 511, 512, *supra,* No. 167. The first one thousand dollars was prop-erly paid. This was an acceptance of the terms proposed in the act, and vested the company with the rights and franchise therein conferred.—*Manaway v. The State,* 44 Ala. 375. The law in question establishes a "franchise" of a peculiar character. A franchise, during the period of its continuance, is said to be an incorporeal hereditament. At common law, it is a royal privilege or branch of the King's prerogative, subsisting in the hands of the subject. And it arose from the King's grant.—2 Bla. Com. p. 37, 38, marg. With us, they are conferred by grant from the government, and are vested in individuals.—*Bank of Au-gusta v. Earle,* 13 Pet. 519, 595, Taney, C. J. They con-tain an implied covenant on the part of the government not to invade the rights vested, and on the part of the grantees to execute the conditions and duties prescribed in the grant. The government can not resume them at pleasure, or do any act to impair the grant, without a breach of contract.—3 Kent, 458, 459. In this definition I use the language of Chancellor Kent; a text writer of but little less authority than a judicial opinion. It seems

to me that it hardly needs an argument to show that such a grant of franchise or privilege can not be impaired by a repealing act. It is also patent to my mind that the general assembly has power to make such a grant, and that this power is not intended to be interfered with, by the *thirty-second* section of the first article of the State constitution. The mere recital of this section of our fundamental law, without more, would seem to refute this idea. I quote its words, so far as they apply to this case. They are these: "No title of nobility, or *hereditary* distinction, privilege, honor, or emolument, shall ever be granted or conferred in this State."—Const. Ala., Art. I, § 32. These words scarcely need interpretation to find out their true sense; that is, the sense in which they were used by the people in their highest State law. Obviously, the people intended, by these words, to impose some limitation on the legislative will of the general assembly. But they did not intend to go beyond what had formerly been customary. They did not intend to cut off the power to grant, for limited periods, merited distinctions and honors to the citizens who had rendered great and important services to the State, or to grant privileges or emoluments to be used for the public good. In other words, they did not intend to prohibit all right to grant any privilege, franchise or emolument whatever. Had this been their purpose, the language used would have been without any qualifying and limiting adjective. The word "hereditary" would have been left out of the sentence altogether. This word qualifies the whole series of particulars enumerated in the sentence, as if it had been repeated before each. The State constitution of 1819 contains a section of similar import with that above quoted, and almost in the identical words. Yet many franchises and exclusive privileges were granted under it, without objection—such as the right to establish toll-bridges, toll-causeways, ferries, and the supplying cities with pure water and gas-lights.—Const. Ala. 1819, Art. I, § 26, Clay's Dig. p. 27; Code of Ala. p. 31; Revised Code, §§ 1383, 1389; *Mobile Water Works, Montgomery Gas*

*Works*; and see the discussions in *Dale v. Governor*, 3 Stew. 387; *Stein v. Mayor of Mobile*, 17 Ala. 234, S. C. 24 Ala. 591; *People v. Utica Ins. Co.*, 15 Johns. 358; *Pres't, &c., of Newburg and Cochecton Turnpike Road v. Miller*, 5 Johns. Ch. R. 101; *Micou v. Tallassee Br. Co.*, January term, 1871. The power to grant and confer privileges, honors or emoluments, intended to be prohibited, were such as were " hereditary," and not such as were limited to a reasonable length of time. Here the limitation was only for ten years at most, or " so long as the said partnership shall choose to do business under the provisions of " said act. " And whenever said company shall fail to pay said sum according to the provisions of said act, then, and in that case, their *right to do business* shall cease." Acts 1868, p. 511, 512, § 2, *supra*. Then, if this right is a franchise, a privilege purchased from the State upon a consideration, it is a *contract*, and can not be repealed. In Colonel Sam. Dale's case, involving a like question, Lipscomb, C. J., declares: "The only question, it seems to me, that can be raised in this case, is, whether a contract has been made between the State of Alabama and the plaintiff, (Dale,) by which he has acquired a vested right to the amount of money directed to be paid to him by the act of 1821. If such a contract was enacted by that act, I have too much respect for the court of which I am a member, to waste time in urging any argument in favor of the position, that it is not only our right, but our duty, and one that can not be evaded, to declare any subsequent act of the legislature, abrogating the contract, wholly void. This doctrine is now too well settled to admit of a controversy."—*Dale v. The Governor*, 3 Stew. 387, 403. Add this to what has already been said against the validity of the repealing act of March 8, 1871, and the argument would seem to be complete.—Pamph. Acts 1870, 1871, p. 217, Act No. 180. The repeal was of no validity, and did not, in any wise, effect the appellee's rights, whatever these may be. In this, I differ and dissent, with respectful regret, from the conclusions of the majority of the court.

Nor is this a corporation such as the legislature can "alter, amend, or repeal." This power is given only where there is a general law of incorporations, or special act passed pursuant to the article of the constitution on "corporations."—Const. Ala. Article XIII, § 1; see Pamph. Acts 1870, 1871, p. 26, "corporations." This is not such a law as those there referred to.

Another objection to the law first above quoted, under which the appellees seek to justify their proceedings, is, that its title is defective. If there were such a class of objections known to judicial tribunals as *petulant* objections, I would be inclined to put this objection in that class. Certainly, a good law ought not to be driven out of court, because its authors were not critically skillful in the invention of names; that is, that they were not persons who could split and divide a hair, "'twixt north and northwest side." It is true, the constitution commands that "each law *shall* contain but *one subject,* which shall be *clearly expressed* in its title."—Const. Ala., Art. IV, § 2; see Pamph. Acts 1870, 1871, p. 8. By reference to the law under discussion, it will be seen that its title contains but one subject; that is to say, the "establishment of the Mobile Charitable Association, for the benefit of the common school fund of Mobile county, without distinction of color." And this is very clearly expressed. It is not to be expected that the details of "the business" of the Association is to be set out in the title of the law, else this would make the title the law itself. In discussing this novel feature in legislation, a distinguished and experienced judicial officer uses the following language: "It would be most mischievous, in practice, to make the validity of every law depend upon the judgment of every judicial tribunal of the State, as to whether an act or bill contained more than one subject, or whether this one subject was clearly expressed in the title of the act or bill. Such a question would be decided according to the mental precision and mental discipline of each justice of the peace and judge. No practical benefit could arise from such inquiries."

*Pim* v. *Nicholson*, 6 Ohio, (N. S.) 179. When the title fairly indicates the main purpose of the law, this is enough. Cooley's Const. Limit., p. 141, *et seq.*, and cases there cited. In this view of the constitutional restriction above quoted, I can not concur with a majority of the court, but respectfully dissent.—44 Ala. 639, 646.

There is one other question that remains now for further consideration. That is this: Does the statute of the 31st of December, 1868, *authorize* "I. Clifton Moses & Co." to *do* the "business" for which they claim protection in their bill? If it does, then I think they have shown sufficient grounds to invoke the aid of the court to protect them in the further continuance of the same, until they make default in the payment of the annual sums required by the act. If it does not, then they are entitled to no relief, and their injunction should be dissolved and their bill dismissed with costs. Then, what is the "business" the "association" is entitled to pursue under the act? The act declares that the "association" was allowed to be formed "for the *purpose* of receiving subscriptions, and to sell and dispose of certificates of subscription, which shall entitle the holder thereof to such prizes as may be awarded to them."—Acts, *supra*, § 1, p. 511. This is the means provided by the law to carry on "business" under the franchise. This may be done, whatever it may mean, without the violation of the statutes against gambling; that is, without keeping a gaming table in the manner forbidden by the Revised Code.—Rev. Code, § 3621. The scheme of operations set out in the bill is clearly that of keeping or exhibiting "a table for gaming." The legislature did not intend to repeal this section of the Code, by the law allowing the formation of this association, and turn loose upon society the evils thus restrained.

I therefore concur in the judgment of the majority of the court.