## Moses & Beebe *v.* Mayor, &c., of Mobile.

*Bill in Equity to enjoin Interference with Franchise.*

1. *Constitutional law; subject-matter of act not clearly expressed in its title.* — The act of the General Assembly of Alabama, entitled "An act to establish the Mobile Charitable Association for the benefit of the common school fund, without distinction of color," approved December 31st, 1868, violates Art. IV. § 2 of the Constitution, and is therefore void. *Horst, Mayor, &c.* v. *Moses, et al.*, reaffirmed on this point.

2. *Legislative franchise; when equity will not enjoin invasion of.* — A court of equity will not interfere to prevent the invasion of a grant or franchise, before the establishment of the right at law, even where it is derived from an act of the legislature, if upon an inspection of the statute, a reasonable doubt exists as to the power of the legislature to enact it.

3. *Injunctions; never granted except in cases of a civil nature, strictly.* — As a general rule, courts of equity cannot interfere to stay proceedings in criminal matters, or in any case not strictly of a civil nature, nor to arrest the authorities charged with the execution of criminal laws, whether the prosecution be for violations of state laws, or for the infraction of municipal ordinances.

4. *Bill of Peace; when allowed.* — A bill of peace will lie only when the right claimed affects many persons; if the right is disputed between two persons only, not for themselves and all others in interest, but for themselves alone, the bill will be dismissed.

APPEAL from the Chancery Court of Mobile.

Heard before Hon. ADAM C. FELDER.

This was a bill in equity filed on the 17th day of August, 1871, by appellants, against the mayor, aldermen, and common council of Mobile; Martin Horst, mayor, R. M. Quinn, chief of police, and M. Phillips and Kassens, assistant chiefs of police, praying that the defendants be perpetually enjoined and restrained from interfering with or disturbing complainants in the enjoyment of the franchise and privileges which enured to them, or in carrying on the business which complainants alleged they were entitled to prosecute by virtue of the following act of the General Assembly of Alabama: "An act to establish the Mobile Charitable Association, for the benefit of the common school fund of Mobile county, without distinction of color.

"Section 1. *Be it enacted by the General Assembly of Alabama*, That I, Clifton Moses and Alfred H. Fowler, of Mobile, Alabama, and Eugene Beebe of Montgomery, Alabama, and their associates as partners, shall have the full right and

[Moses *v.* Mayor, &c., of Mobile.]

authority to form themselves into a partnership association, to be known under the firm name and style of "I. C. Moses & Co.," or such other name as they may designate, for the purpose of receiving subscriptions, and to sell and dispose of certificates of subscription, which shall entitle the holder thereof to such prizes as may be awarded to them, which distribution of award shall be fairly made in public, by casting of lots or by' lot, chance, or otherwise, in such manner as to them may seem best to promote the interest of the school fund of Mobile county, which said distribution of award and prizes, shall be made at their office in the city of Mobile, or such other place or places in the State as they may direct.

"Section 2. *Be it further enacted,* That before commencing business under the provisions of this act, said parties shall pay, or cause to be paid, to the board of school commissioners of Mobile county, for the use of the public schools of said county, the sum of one thousand dollars, and annually thereafter a like amount, for the term of ten years, or so long as said partnership shall choose to do business under the provisions of this act. It being understood and agreed, that said payment of one thousand dollars per annum by said partnership to said common school fund is the consideration upon which this privilege is granted ; and whenever said company shall fail to pay said sum, according to the provisions of this act, then, and in that case, their right to do business shall cease.

"Section 3. *Be it further enacted,* That during the time business shall be done under the provisions of this act, the same shall be exempt from taxation, except for state purposes.

"Section 4. *Be it further enacted,* That this act shall remain in full force and effect for ten years, upon the consideration herein contained, during which time said partnership company shall have the right to exercise the privilege and franchise herein given, any law to the contrary notwithstanding. Approved December 31, 1868."

The bill then states facts showing a compliance on the second of February, 1869, with the requirements of said act, and the facts alleged as an excuse why the last of the annual payments was not made. The statements of the bill as to the nonpayment of the last annual payment of $1,000 were denied in the answer, which alleged that the complainants had forfeited their franchises by this failure ; but as the case did not turn on this point, it is unnecessary to refer further to the matter of this payment.

It is further alleged in the bill, that complainants had expended large sums of money in carrying on, and in preparing to carry on their business, and to comply with the requirements of said act. The bill then alleges that, in pursuance of their

business, " as they were authorized by the said act, and con-
ducting their said business in strict and entire accordance with
the terms and provisions of the said act, that, in pursuance of
their said business, they sold and disposed of certificates of
subscription, which, by the terms thereof, and in fact, entitled
the holders thereof to such prizes as might be awarded to them
in the casting of lots as aforesaid, and that the distribution of
awards was in each case made fairly in public by the casting
of lots.     That, for the purposes aforesaid, they adopted the
means or contrivance of what is called a roulette wheel and
ball as the lot or chance, which to them seemed best to carry
out·the object and purposes of the said act.     That the roulette
wheel is a revolving circle with a number of holes attached
thereto, each of which is numbered, and the wheel is revolved
in one direction, and at the same time a ball is thrown re-
volving upon and inside of said wheel in the opposite direction
from that in which the wheel is revolved, and when the ball
settles down in any one of the holes, the number attached to
that hole is entitled to a prize ; and that they have in all cases
cast lots as aforesaid, and in the manner aforesaid, fairly and
in public, and made such distribution of awards and prizes
fairly and in public, and that in each case of said casting of
lots as aforesaid there was only one set of said certificates sold
or disposed of for each of said castings of lots as above said
and described."     It is further alleged in the bill " that in
addition to the wheel and ball as above stated, they also at
times, since December, 1870, used and are still using another
method of determining by lot or chance the prizes in their said
business, of the following character : in an oblong box are
deposited ninety balls, each numbered from one to ninety ;
printed certificates of subscription issued to purchasers, each
certificate containing three rows of numbers, five in each row ;
the number of certificates are numbered from one to one hun-
dred and ninety-two inclusive, and the purchaser of the cer-
tificate selects any number of the certificate he desires ; each
certificate has different figures from every other certificate ;
the oblong box is revolved, and a ball is thrown out ; the box
is again revolved, and another ball is thrown out, and so on
successively until the numbers on the balls so thrown out cor-
respond with all the numbers in one of the rows on some one
of the certificate, and when this occurs, the holder of such is
entitled to the prize designated, and thus awarded ; and that
in each and every instance in the casting of said lots, either by
said roulette wheel and ball, or by the oblong box and balls as
aforesaid, the same has been conducted fairly and in public,
and the distribution of awards so made and ascertained has
been made in public ; and that the selection of said modes of

[Moses v. Mayor, &c., of Mobile.]

determining the prizes and the distribution of the same was made by your orators as the modes of lot or chance to determine the same, because these modes seemed best to your orators to promote the object of the first said act, and that the mode adopted as aforesaid by the use of the oblong box and balls, is upon the same principle as the game called keno is played or carried on."

. The bill further states facts showing that on divers days in April and in June, 1870, and also in August, 1871, one of complainants and several of their agents had been arrested by the police officers of the city of Mobile; and, as they alleged, under authority of the laws and ordinances of the city of Mobile, on the ground that complainants and their agents, in carrying on said business, were violating the ordinances of the city of Mobile against exhibiting a gaming table. The bill further alleges that said police officers had arrested various persons attending the drawings had by complainants in carrying on their said business, and that the police officers and city authorities had repeatedly avowed their determination to arrest complainants and their agents, and would in the future continue to arrest them, upon the alleged ground that the business carried on by complainants and their agents was not authorized by the charter, and was in violation of the city ordinances against exhibiting gaming tables, &c.

The bill also alleges, that by reason of the arrests, annoyances, and hindrances above referred to, many persons had been prevented and were prevented from purchasing tickets at complainants' drawing; that complainants' business has been greatly injured thereby, they having been at great expense in preparing to carry on the same; that by reason of the arrests, &c., complainants have been damaged in their business, and put to great expense, and sustained large losses, and their business nearly broken up; that if the city authorities and police officers continue to disturb and hinder complainants, and arrest them and their agents and persons who attend the drawings, as complainants charge that defendants will, and, as they likewise avow, complainants' business will be utterly broken up and destroyed, and their franchise and the privileges conferred by said act rendered utterly valueless.

It is further alleged in the bill that the police officers who made the arrests referred to, have not more property than is by law exempt from levy and sale on execution.

The bill sets out that portion of the charter of the city prescribing by whom and in what manner arrests may be made for the commission of any public offence or violation of any city ordinance within the limits of the city of Mobile, and alleges that the mayor, aldermen, and common council, and the

[Moses *v.* Mayor, &c., of Mobile.]

police officers making or ordering the arrest of complainants and their agents; or of persons purchasing certificates of subscription in complainants' drawings, as before detailed, would not be liable to complainants for the damage and losses complainants have already sustained, and would sustain by reason of the ordering and making of such arrests, inasmuch as defendants would be exercising judicial power, or power in its nature judicial, and in making such arrests themselves, if sued therefor for false imprisonment, could and would allege that they had reasonable grounds for such arrests, and would therefore be free from responsibility for such arrests. The bill further alleges " that unless complainants are protected by a court of chancery, they will be damaged to an extent and in a manner that cannot be estimated at law," " that their business is of that character which depends on the number of certificates of subscription purchased in their business, and it will be impossible to make any estimate thereof to any certainty by legal evidence, and for that reason no possible remedy at law can compensate them therefor, even if they could sustain action at law, and recover damages for such interference and disturbance of their said business."

The mayor, aldermen, and common council, Martin Horst, mayor, and the persons holding the offices of chief of police, and assistant chiefs of police, are made defendants. Complainants also prayed for the issue of a writ of injunction " directed to said Martin Horst, as mayor aforesaid, enjoining and restraining each and every member of the police force of said city, through him, the said mayor, as the head thereof, from interfering with or disturbing your orators, in the carrying on of their said business, either in the use of the scheme of the roulette table and ball, or in the use of the scheme of the revolving oblong box and balls, on the principle of the game called keno ; or in the sale of their said certificates of subscription in either of said schemes, or disturbing any of their agents employed in carrying on their said business on the plans of either of said schemes, either by arresting your orators or any of their said agents, on the charge or pretence of violating thereby any ordinance of said city against gaming or against exhibiting a gaming table, either for any past or future acts done by them, or their said agents, in carrying on their said business as aforesaid, on the several schemes as aforesaid, or otherwise disturbing them therein."

There was also a prayer for a similar injunction against interference with persons who had become or might become holders of certificates of subscription, &c., and that on final hearing the injunction prayed be made perpetual. Sworn answers to the bill were waived.

[Moses v. Mayor, &c., of Mobile.]

Application for an order for the issuance of injunction was made to a circuit judge, who granted the order, and upon complainants complying with the conditions prescribed in the *fiat*, the injunction issued as prayed for.

The defendants all answered. The answers allege that the act under which complainants' claim to carry on their said business was unconstitutional and void; that the privileges which said act purports to grant, are privileges not enjoyed by, and which it is not lawful for, a citizen of Alabama at large to enjoy; but that, on the contrary, the citizens of Alabama at large are by its penal laws expressly forbidden to enjoy such privileges, and that the exercise of such privileges are forbidden within the limits of the city of Mobile, by the ordinances thereof.

It is admitted that complainants, after the passage of the act, begun the business of carrying on a lottery; but the respondents distinctly denied that complainants did this "under the provisions of and strictly in accordance with the terms of said act; and say that, on the contrary they disregarded and failed to perform at the very outset the conditions imposed on them by said act, as the consideration thereof; and respondents insist that without the performance of said considerations, according to the terms of said act, no rights passed to complainants under said act, even if the said act were constitutional. Respondents say that complainants and their associates have not confined themselves to the business of carrying on a lottery, as contemplated by said act, but have abandoned the business of keeping and carrying on a lottery only, and have persistently and cunningly evaded the spirit, letter, and intent of said act, by various devices, and have set up, established, operated, kept, and carried on, in the city of Mobile, various devices which are not lotteries; and among them the device of roulette wheel and ball, and also the device known as keno, which are common gamblers' devices and gaming tables, and not lotteries, and which are other than and different in substance from the lottery devices first established by them as aforesaid; and respondents say that complainants, under pretext of cover by said act, have set up, kept, and maintained several gambling dens in the city of Mobile, at various places, wherein the said gambling table and device are kept, and in which the public is allured and invited to game for money, greatly to the demoralization of the citizens of Alabama."

The answers also set up facts to show that complainants had forfeited their franchise by non-payment of one of the annual payments required by the act, and denying the validity of excuses for such non-payment as set up in the bill; but as this part of the case had no material bearing upon the decision, it is not necessary to allude further to it.

In the answers, an elaborate and detailed account is given of the mode and manner in which complainants carry on their business. Drawings and exhibits are attached to the answers, to show that the scheme of drawing, and mode of carrying on the business, was but a " cunning device to carry on gaming, and to promote the avaricious purposes of complainants to their own profit, without any regard to the object or purposes of said act, or the benefit of the common school fund of Mobile county." It is also alleged that " the device of a roulette wheel and ball is not, truly speaking, a lot or distribution of awards, but that the same is a common gambler's game, well known by gamblers, and in use by them as a gaming table in almost all the gambling dens in Europe and America."

It is impossible, without greatly and improperly lengthening the report of the case, to give a more extended synopsis than has already been given, of the minute and lengthy description in the answer of the mode and manner in which complainants carried on their business.

The arrests are admitted, and a purpose avowed to continue them in all lawful modes, to break up what respondents state they are advised is but a mere cover or device for carrying on gaming, and a violation of the laws of the State and the ordinances of the city.

The respondents (appellees) also demurred to the bill on the following grounds :

" 1. That there is no equity in the said bill.

" 2. That said bill shows on its face that complainants have not complied with the terms and conditions upon which the privileges, which the said act of 31st December, 1868, purports to give them, were granted.

" 3. That said act of December 31st, 1868, is repealed.

" 4. That said bill seeks to enjoin Martin Horst, as mayor of Mobile, and through him the police force of Mobile City, from the exercise of powers conferred on them by law.

" 5. That said bill, in effect, seeks to enjoin and restrain the mayor of Mobile, sitting in, and holding and presiding over the mayor's court of Mobile, from exercising the quasi criminal jurisdiction conferred on him by law.

" 6. That said bill seeks to enjoin and restrain the mayor of Mobile from exercising the duties and authority conferred on him by law, as ex-officio justice of the peace and magistrate.

" 7. That said bill seeks to enjoin a trespass.

" 8. That said bill shows that complainants have an adequate remedy at law.

" 9. That the chancery court has no jurisdiction of the case made by said bill."

The bill was filed August 17th, 1871.

[Moses v. Mayor, &c., of Mobile.]

The appellees, on October 17, 1871, made a motion in vacation to dissolve the injunction, "upon the denials in the answer, and the demurrers filed and for want of equity," which motion was overruled by the chancellor. An appeal was taken from the decision of the chancellor, and said decision was reversed by the supreme court (see 48th Ala. 129), and the cause remanded. Afterwards, in the chancery court below, the bill was dismissed, on motion, for want of equity, and the appellants Moses and Beebe appealed.

JNO. A. ELMORE, and RICE, JONES & WILEY, and O. J. SEMMES for appellants. Upon acceptance of the provisions of the act (Acts 1868, p. 511) by the persons therein named, it became a legislative contract. *Manaway* v. *The State*, 44 Ala.; *Horst* v. *Moses*, 48 Ala. 146, and authorities there cited; *State* v. *Heyward*, 3 Rich. (So. Car.) Law Rep. 389; *Oliver* v. *Lee & Co.'s Bank*, 21 N. Y. 14; *Boyd* v. *State*, 56 Ala. 329.

" It is true that legislative contracts are to be construed most favorably to the State, if, on *a fair consideration* to be given the charter, any *reasonable doubts* arise as to their proper interpretation; but as *every contract* is to be construed *to accomplish the intention of the parties to it*, if there is *no ambiguity* about it, and *this intention clearly appears on reading the instrument*, it is as much the duty of the court to uphold and sustain it, as if it were a contract between private persons." *Home of the Friendless* v. *Rouse*, 8 Wallace, 437; *The Washington University* v. *Rouse*, 8 Wallace, 440. Testing the contract in question by these rules, there does not seem to be any rational doubt as to its true meaning. ' 8 Wallace, 437.'

It contains but one condition precedent, viz.: the payment of one thousand dollars to the board of school commissioners; all the other payments were in the nature of conditions subsequent. *Manaway* v. *The State*, 44 Ala. The just construction of the act is, that the partnership " may terminate the contract at pleasure, but that the State cannot do so before the termination of the ten.years, except in cases of forfeiture. 48 Ala. 141–6. A contract may be optional as to one party, and obligatory on the other. *Disborough* v. *Neilson*, 3 Johns. Cases, 81.

This legislative contract cannot be impaired or destroyed, either by subsequent legislation, or by subsequent judicial decisions of state tribunals. . . . . Judicial oscillation. of state courts cannot be tolerated to the extent of converting into nullities contracts which at first had been treated as valid by all departments of the state government. *Gelpcke* v. *Dubuque*, 1 Wallace, 175; *Township of Pine Grove* v. *Talcott*, 19 Wallace, 678; *Olcott* v. *The Supervisors*, 16 Wallace, 678; *Delmas* v. *Insurance Co*. 14 Wallace, 661.

[Moses v. Mayor, &c., of Mobile.]

In all cases of waste or destruction of franchises the court interposes by injunction against state or subordinate municipal officers, for the same causes and for like reasons that would induce it to interpose against mere private persons who ruinously interfere with the exercise of franchises granted by statute. *Osborn* v. *U. S. Bank*, 9 Wheaton, 340–2; *Davis* v. *Gray*, 16 Wallace, 203; *Mayor, &c. of Columbus* v. *Rodgers*, 10 Ala. 37.

*Resemblance*, however great, is not *legal identity*. In *legal contemplation* the distribution of awards and prizes upon *the principle* on which "a game called keno," is played, is not *per se* that game. A game played with dice and "conducted upon the principles of a raffle, is not a raffle, but a different thing." *Jones* v. *State*, 26 Ala. 155.

R. H. & R. I. SMITH and THOMAS H. HERNDON, *contra.* — The bill is filed to enjoin criminal prosecutions; there is no such thing known; it is the same thing in principle, as if a grand jury was enjoined, or a solicitor or a judge, from trying a criminal case. *Burnett* v. *Craig*, 30 Ala. 135; 1 Waterman's Eden on Injunctions, marg. p. 68. This injunction is in effect against a court; the mode of preventing a court from usurping jurisdiction is by prohibition, not by injunction.

The title of the act gives no indication of such power of gaming as is contended for; if therefore the act is sufficient to express the power, the act is void, because the subject of the law would not be clearly expressed in the title. Const. of Ala. Art. IV. § 2; Cooley, Const. Lim.; 48 Ala. 144 (per SAFFOLD, J.).

The bill seeks the protection of the court to exhibit two well-known gambler's games, roulette and keno; if what complainant proposes to play is, not roulette and keno, he should have shown the difference. Sections 3621, 2, 3 of Rev. Code, prohibit betting on any gaming table, licensed or unlicensed. That the act of 1868, under which complainant claims, does not sanction what he insists upon doing, see *Horst* v. *Moses*, 48 Ala. 129; *Miller* v. *State*, 4 Ala. 122; *Aicardi* v. *State*, 19 Wallace, 635.

The annual payments were necessary, and the franchises (if any) were lost by failure to make such payments, and the repeal of the act of 1868 was good. Per PECK, C J., in *Horst* v. *Moses*, 48 Ala. 139. See also Acts 1870–1, p. 217.

BRICKELL, C. J. — The object of these bills is to obtain injunctions restraining the appellees, who are municipal officers of the city of Mobile, from prosecuting suits against the

appellants, or their agents, for violations of the ordinances of the city.

It cannot be denied that it is competent for the general assembly to delegate to municipal corporations the power to make by-laws and ordinances, which, when authorized, have the force, as to persons bound thereby, of laws passed by the general assembly. Dillon on Mun. Cor. § 245, *Intendant of Marion* v. *Chandler*, 6 Ala. 899; *Mayor of Mobile* v. *Rouse*, 8 Ala. 515; *Mayor* v. *Allaire*, 14 Ala. 400. The city of Mobile is expressly clothed with power " to impose and appropriate fines, penalties, and forfeitures for the breach of the ordinances or by-laws," enacted by its corporate authorities. In the absence of an express grant of such power it would be implied; as an ordinance or by-law, without a penalty, would be nugatory. Dillon on Mun. Cor. § 272, *Intendant of Marion* v. *Chandler*, *supra*. The charter of the city prescribes the manner in which the corporate ordinances are to be enforced, and penalties for their violation inflicted. The remedy thus prescribed is exclusive, and has the form and characteristics of a prosecution for a violation of the criminal law, commenced before a justice of the peace, or other committing magistrate. In the exercise of the power conferred on him, to issue warrants of arrest, and to hear and determine accusations for violation of the corporate ordinances, the mayor acts judicially, and his court is an inferior court or jurisdiction. *Withers* v. *State*, 36 Ala. 252; *Intendant of Marion* v. *Chandler*, *supra*. A proceeding before the mayor, or other corporate authority, for a violation of an ordinance, is not a civil proceeding. It is a *quasi* criminal proceeding, punitive, and intended to protect and preserve the peace and good order of the corporate community, as criminal proceedings are intended for the preservation of the peace and dignity of the State. *Withers* v. *State*, *supra*; *Mayor* v. *Rouse*, 8 Ala. 515; *Brown* v. *Mayor*, 23 Ala. 722. The ordinances the appellants are charged with violating are directed against gaming within the city, and the mayor, aldermen, and council are clothed with authority to pass such ordinances.

At one time, the court of chancery in England exercised a jurisdiction partaking of a criminal character, but it was not without objection and protest from the commons, and the common law courts. It was excused, rather than justified, because of the inability of other tribunals to maintain internal peace and order, and because it was exercised for the defence of the poor and helpless. It passed away, when the necessity for its exercise ceased, and the common law tribunals were restored to power sufficient for the repression of violence and wrong. 1 Spence Eq. Jur. 341, chap. 4. Since, the jurisdiction of a

[Moses v. Mayor, &c., of Mobile.]

court of equity has been purely and exclusively civil. The statute of this State declares its powers and jurisdiction shall extend to all "civil causes," in which a plain and adequate remedy is not provided in other judicial tribunals. R. C. § 698. The statute merely affirms and declares the existing law. In the case of *Lord Montague* v. *Dudman* (2 Vesey, Sen. 396), Lord Hardwicke, said : " This court has no jurisdiction to stay proceedings on a *mandamus*, nor to an indictment; nor to any information ; nor to a writ of prohibition, that I know of." Lord Eldon, said : " It is well established by authority, that this court has originally no jurisdiction whatever either to enjoin or regulate the proceedings upon an indictment; but circumstances may give that jurisdiction ; when, for instance, the relators are the persons prosecuting the indictment, I should have a control by order personally affecting them ; but I am not satisfied that I have the same control over these defendants who have not come in." *Att'y Gen.* v. *Cleaver*, 18 Vesey, 219. In *Holderstaffe* v. *Sanders* (6 Mod. 16), Holt, C. J., said : " Surely chancery will not grant an injunction in a criminal matter under examination in this court ; and if they did, this court would break it, and protect any that would proceed in contempt of it." The most approved elementary writers, citing these authorities, state it " as a general rule, that courts of equity will not interfere to stay proceedings in criminal matters, or in any cases not strictly of a civil nature. They will not grant an injunction to stay proceedings on a mandamus, or an indictment, or an information, or a writ of prohibition. 2 Story's Eq. § 893 ; 2 Dan. Ch. Pr. 1620 ; Hilliard on Inj. 19, § 30, 223, § 7. Following these authorities, this court, in *Montgomery & W. P. R. R. Co.* v. *Walton* (14 Ala. 209), declared : " The courts of law have complete jurisdiction to punish the commission of crimes, and can interpose to prevent their commission by imprisoning the offender, or binding him to keep the peace. But courts of equity have no jurisdiction over such matters ; at least a court of equity cannot entertain a bill on this ground alone." The case of *Burnett* v. *Craig* (30 Ala. 135) does not in principle differ from the cases under consideration. The purpose was, as in these cases, to obtain the interference by a court of chancery, to restrain municipal authorities from repeated prosecutions for violations of municipal ordinances. Declaring the prosecutions were *quasi* criminal proceedings, the court said a bill in chancery, to restrain a malicious or unfounded prosecution, is certainly of novel impression, and that there was neither principle or authority to support it. A similar decision was pronounced in *West* v. *Mayor of City of New York*, 10 Paige, 539. The principle rests not only on the character of the proceeding for

[Moses v. Mayor, &c., of Mobile.]

violations of municipal ordinances, but because if the accused is not liable to the penalty, the defence at law is perfect. Municipal authorities would be paralyzed in discharging the public duties intrusted to them, if every offender, against the ordinances they have proclaimed, could, by injunction, arrest them, or could, by multiplying his offences, invoke the interference of a court of equity. If the court could take jurisdiction, and should determine the municipal ordinances valid, and that the party complaining was guilty of its violation, it could only remit him to trial before the tribunal having jurisdiction. It could not impose the penalty denounced by the ordinance. If corporal punishment is the penalty, or a part of it, through the interference of the court, it could be escaped. It seems evident, that a court of equity cannot interfere to arrest the authorities charged with the execution of the criminal law, whether it pertains to the state at large, or to the municipalities, which are agencies in the administration of civil government.

The counsel for the appellants have sought to withdraw the case presented by the bills, from the operation of this general principle, and the authorities by which it is supported, upon the ground that the interference of a court of equity is necessary in this case for the prevention of vexatious litigation, and of a multiplicity of suits. It could well be said in answer, the litigation and multiplicity of suits apprehended, are criminal in their character, and without the jurisdiction of the court. The prevention of litigation under some circumstances proves a subject for equity jurisdiction. The foundation of the jurisdiction is the quieting and suppression of litigation, and the remedy is known as a "Bill of Peace." To entitle a party to maintain it, there must be a right claimed affecting many persons; "for if the right is disputed between two persons only, not for themselves, and all others in interest, but for themselves alone, the bill will be dismissed." 2 Story's Eq. § 857 ; *Morgan* v. *Morgan*, 3 Stew. 383 ; *Gunn* v. *Harrison*, 7 Ala. 585. In the case of *Eldridge* v. *Hill* (2 Johns. Ch. 281), the defendant had sued the complainant for a nuisance, and at the expiration of each week, sued for its continuation until there were fifteen or twenty suits pending, and he threatened to sue indefinitely, until an abatement. The bill was filed for an injunction to restrain the prosecution of all the suits but the one for the erection of the nuisance, and the commencement of any others, until that should be determined. Ch. J. KENT refused the injunction, saying: " No case goes so far as to stop these continued suits between two single individuals, so long as the alleged cause of action is continued, and there has been no final or satisfactory trial and decision at law upon

the merits." In that case, as in this, the complainant was seeking to prevent suits which could only arise from a continuation of his own acts, each giving (as was supposed) a new cause of action. The determination of any one of these suits, would have finally settled the litigation. Whether the obstruction of a flow of water, by the complainant, was a nuisance, authorizing an action at law, by the defendant, was necessarily involved, and must have been decided in each and all of these suits. The judgment in any one of the suits, would have been evidence, and conclusive evidence on this point, in all the others. If the complainants were preferring a right or claim affecting numerous parties, the judgment against one would not be binding on, or evidence against, the others, and hence a court of equity sometimes interferes to prevent the multiplicity of suits, and the continuance of litigation, which would be necessary to quiet the right. But when one party only is interested, and the right has not been established at law, the court will not intervene — the necessity of intervention does not exist. In *West* v. *Mayor of New York, supra,* the jurisdiction was attempted to be maintained on this ground, but the chancellor said: " I am not aware of any case in which this court has sustained such a bill, to prevent the defendant from suing at law, where the rights of the parties depended upon a question of law merely, and where the defendant in the suit at law must eventually succeed without the aid of this court, if the law was in his favor." " The separate repetition of trespasses," say the supreme court of Ohio," laying a ground for separate suits, between the same parties, is not that description of multiplicity of suits, which induces equity to interfere." *McCoy* v. *Chilicothe,* 3 Ohio, 379. We cannot resist the conviction, that it would promote, rather than quiet litigation, if, under the protection of a temporary injunction, a party could repeat acts, each of which may furnish his adversary just cause of action. The equity of these bills cannot be supported as necessary to the prevention of a multiplicity of suits. If the prosecutions are unfounded, the defence at law is perfect, and if well founded, there should be no interference with the tribunals having exclusive jurisdiction of them. If a doubt as to the liability of the appellants to prosecution exists, they could avoid all multiplicity of suits, by abstaining from the acts which give rise to them.

It was also insisted, that the statute under which the appellants claimed the right to do the acts charged to be infractions of the city ordinances, conferred upon them franchises or special privileges which were threatened with destruction, and which a court of equity alone could preserve from invasion and destruction. A court of equity frequently intervenes when the

[Moses v. Mayor, &c., of Mobile.]

courts of law cannot afford adequate remedies to prevent the violation of franchises, or special privileges granted by the legislative authority of the State. A difference observed in cases of this character, and where mere private rights, not originating in express legislative grant, or dependent on special legislative enactment, are involved is, that the owner of the franchise or privilege, is not compelled to a suit at law for the establishment of his right, as a condition precedent to equitable interposition. The legislative grant, or enactment, is regarded as equivalent to a judgment of a court of law declaring the right. High on Inf. 319, § 571. The right must be clear, and the party in its undisputed possession or exercise. If a doubt exists as to the right, or it is uncertain whether the acts complained of are infractions of it, a court of equity ought not to interfere, until the right is ascertained at law. *Morr* v. *Veazie* 31 Me. 360; *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. 35. If the franchise or privilege is assailed as invalid, because of the unconstitutionality of the statute from which it is derived, and on an inspection of the statute a reasonable doubt exists whether the legislature had the power to enact it, a court of equity would not interfere. It is only when the court, on an inspection of the statute, has not reasonable doubt of its constitutionality, that it will interpose, to prevent the invasion of the privilege or franchise it confers. *Morr* v. *Veazie, supra.*

Conceding the bills present a clear case of invasion, and threatened destruction of the statutory privileges and franchises claimed by the appellants, we are compelled to inquire into the constitutionality of the statute from which they are derived. When these cases were before this court at the June term, 1872, a majority of the court pronounced the statute in violation of the Constitution. We concur fully in the opinion of Judge SAFFOLD, that it offends the constitutional mandate, that " each law shall contain but one subject, which shall be clearly expressed in its title." *Horst, Mayor, &c.* v. *Moses*, 48 Ala. 129. The decision then rendered should have put an end to this litigation and should have been regarded as a final condemnation of the statute, and the rights and privileges which have been claimed under it.

The history of this clause of the Constitution, the purposes it is designed to accomplish, and the policy in which it is founded has been, in this and other courts, the subject of frequent consideration. It is of comparatively recent origin, and produced a radical change in the established modes of legislation. It is not matter of surprise that the construction and interpretation it should bear, was matter of constroversy, which judicial decision alone could finally determine. The courts have carefully avoided a construction which would embarrass legislation.

Sentence of nullity has not been pronounced against legislative enactments, because of the generality and comprehensiveness of the titles with which they may be introduced, when these fairly indicate the general subject of the enactment. They have firmly demanded that the title should avoid deception as to the subject of the enactment, and should announce that subject. *Ex parte Pollard*, 40 Ala. 98 ; Cooley Cons. Lim. 143–146.

This constitutional prescription of a rule of legislation, can have been intended to accomplish but one purpose, the suppression of a practice previously too prevalent, leading to unfortunate, and sometimes corrupt legislation, by which several projects, or subjects having no proper relation to each other were combined, and the supporters of each united in passing all into laws ; and the prevention of the deception of the legislature and the people, by concealing under alluring titles, legislation which, if its real character had been disclosed, would have been denounced. The statute we are considering is confined to one subject ; the inquiry is, whether that subject is expressed in the title. When the subject and the title are compared, it seems to us ingenuity could not have devised a title more delusive and less expressive of the real purpose and subject of the statute. It is entitled " An Act to establish the Mobile charitable association, for the benefit of the common school fund of Mobile county, without distinction of color."

The first section authorizes four persons who are named, and their associates to form themselves into a partnership, " to be known under the firm name and style of I. C. Moses & Co. or such other name as they may designate." The purpose of this partnership is, " receiving subscriptions, and selling and disposing of certificates of subscription which shall entitle the holder thereof to such prizes as may be awarded to them, which distribution of award shall be fairly made in public, by casting of lots, or by lot, chance, or otherwise, in such manner as to them may seem best to promote the interest of the school fund of Mobile county ; " " the distribution of award and prizes," to be made in Mobile, or such other place in the State as they may direct. The second section required the partnership to pay annually to the common school fund of Mobile county, one thousand dollars in consideration of the privilege conferred by the first section. The third section exempts the partnership from all other than state taxation. The fourth section continues the act for ten years, " during which time said partnership company shall have the right to exercise the privilege and franchise herein given, any law to the contrary notwithstanding." We refrain from all discussion of this singular and remarkable statute, confining our inquiries only into its conformity

[Owens *v.* State.]

to the ·constitutional provision, to which reference is made. The subject of the statute as expressed in the title, is the establishment of a charitable association. If the statute is valid, it authorizes the formation of a partnership with a partnership name, without any of the distinctive characteristics of an association, which is without personality, invisible, intangible, except through its officers and agents. Reading the title, all schemes for mere individual gain or profit would seem to be excluded, and the advancement of the public good the primary controlling purpose. The statute is devoted chiefly, if not entirely, to the mere pecuniary profit of the partnership, while the only possible public benefit is secondary, insignificant; and that the statute may bear the appearance of a legislative grant, or contract, is to be paid into the school fund, as *a consideration* for the franchise or privilege the partnership enjoys. The title indicates that the subject of the statute not only comports with, but is in advancement of public morality, while the real subject so far as it can be intelligibly deduced from the vague generalities in which it is expressed, without statutory indulgence or dispensation, would be offensive to the criminal law. The constitutional provision is vain and useless if this enactment can be supported. The state is not freed from its liability to unwise or vicious legislation against which it was intended to guard, but may be involved in it to the same extent as if this provision had never been incorporated in the Constitution. The legislature can be misled by titles fair and unobjectionable, into the adoption of measures the most odious, and wholly alien to the title. Convinced that the statute is violative of the Constitution, no franchise or privilege is conferred on the appellants. All interference with the municipal authorities in enforcing the ordinances the appellants were charged with violating, was unwarranted. The decrees of the chancellor are thereupon affirmed.